THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:16-cr-00062 |
| | : | (JUDGE MARIANI) |
| TRENTON GUNN, | : | |
| | : | |
| Defendant. | : | |

FILED
SCRANTON

APR 0 9 2024

Per_____
DEPUTY CLERK

## MEMORANDUM OPINION

### I. INTRODUCTION

On January 23, 2018, pursuant to a written plea agreement (Doc. 23), Trenton Gunn entered a plea of guilty as to Count 1 of the Government's Indictment (Doc. 1) charging him with Conspiracy to Distribute and Possess with Intent to Distribute More than 500 Grams of Methamphetamine in violation of 21 U.S.C. § 846. (*See* Doc. 55.) Presently before the Court is Gunn's 28 U.S.C. § 2255(a) Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 68). For the reasons set forth below, the Court will deny Gunn's § 2255 Motion.

### II. BACKGROUND

In late 2015, Los Angeles County law enforcement officials investigated Gunn, a resident of California, for drug trafficking. (Final Presentence Investigation Report, Doc. 34, at 4.) In exchange for prosecutorial consideration at the state level, Gunn provided information to California law enforcement officials, including the names of individuals in the

Middle District of Pennsylvania that he supplied with methamphetamine. (*Id.*) Based upon that information, Los Angeles law enforcement officials contacted agents in the Drug Enforcement Agency (DEA) in the Middle District of Pennsylvania. (*Id.*)

Drug Enforcement Agency (DEA) agents travelled to California on February 22, 2016 to interview Gunn. (*Id.*) During the interview, Gunn admitted to shipping packages, weighing two (2) or three (3) pounds each, of methamphetamine, to individuals in Susquehanna County for approximately a year. (*Id.*)

On March 15, 2016, a grand jury sitting in the Middle District of Pennsylvania indicted Gunn on one count of conspiracy to distribute and possess with intent to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. § 846. (*See* Indictment, Doc. 1.) On September 29, 2016, Gunn entered into a plea agreement with the Government. (Doc. 23.) Because Gunn resided in California, he requested that Probation prepare a pre-plea Presentence Investigation Report (PSR). (Doc. 28.) The Court granted this request (Doc. 29), and the Probation Office filed the final PSR on May 23, 2017. (Doc. 34.)

In the PSR, the probation Office determined that Gunn was subject to a Total Offense Level of 29. (*Id.* ¶¶ 24, 34.) This resulted in a Sentencing Guideline Range of 108-135 months in prison. (*Id.* ¶ 57.) Because of the amount of methamphetamine that Gunn was responsible for distributing, his mandatory minimum sentence of imprisonment was 120 months, thereby changing the guidelines to 120-135 months in prison. (*Id.* ¶ 57); 21

U.S.C.A. § 841(b)(1)(A)("such a person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life"); *see also* USSG § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."). On January 9, 2018, the Government filed a Motion Recommending Downward Departure. (Doc. 47.) The Government requested that the Court depart from the mandatory minimum sentence and depart two levels from the guideline range. (*Id.*)

On January 23, 2018, the Court held a change of plea and sentencing hearing for Gunn. (Transcript of Change of Plea/Sentencing, Doc. 73 at 24.)[1] At the hearing, the Court granted the Government's departure motion and applied a guideline range of 87-108 months of imprisonment. (Doc. 73-2 at 41:7.) The Court considered the arguments of the Government and Gunn's counsel and applied the sentencing factors listed in 18 U.S.C. § 3553(a). (*Id.* at 37:18-23, 38:8-25.) The Court then sentenced Gunn to ninety-six (96) months of imprisonment and five (5) years of supervised release. (*Id.* at 42:6-19.)

On February 6, 2018, Gunn filed a timely notice of appeal. (*See* Doc. 59.) On November 7, 2018, the Third Circuit affirmed Gunn's conviction and sentence in an unpublished opinion. *See United States v. Gunn*, 754 F. App'x 76 (3d Cir. 2018). On

---

[1] On October 20, 2016, Gunn filed an unopposed motion to continue the change of plea hearing and for an Order directing the preparation of a Pre-Plea Presentence Report and Request for Plea and Immediate Sentencing after Disclosure of the Presentence Report. (Doc. 28.) On the same day, the Court granted Gunn's motion and ordered that "[t]he Probation Office is directed to prepare a pre-plea PSR" and that "[a] guilty plea and immediate sentencing hearing will be scheduled after disclosure of the Presentence Report to the parties." (Doc. 29.)

February 19, 2019, Gunn filed a petition for rehearing. On March 7, 2019, the Third Circuit denied Gunn's petition and thereafter, on March 15, 2019, issued a Mandate again affirming Gunn's conviction and sentence. (*See* Doc. 62.) On April 14, 2020, after exhausting his appellate rights, Gunn filed the current § 2255 Motion. (Doc. 68.)

### III. STANDARD OF REVIEW

#### a. 28 U.S.C. § 2255

A federal prisoner in custody under the sentence of a federal court may, within one year from when the judgment becomes final, move the sentencing court to "vacate, set aside, or correct" a sentence "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). A federal prisoner may also file a § 2255 motion within one year from "[t]he date on which the right asserted was initially recognized by the Supreme Court, if that right was newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. 2255(f)(3). A § 2255 motion may attack a federal prisoner's sentence on any of the following grounds: (1) the judgment was rendered without jurisdiction; (2) the sentence imposed was not authorized by law or otherwise open to collateral attack; or (3) there has been such a denial or infringement of the Constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack. 28 U.S.C. § 2255(b).

Section 2255 does not, however, afford a remedy for all errors that may have been made at trial or sentencing. *United States v. Essing*, 10 F.3d 968, 977 n.25 (3d Cir. 1993).

4

Rather, § 2255 permits relief for an error of law or fact constituting a "fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Eakman*, 378 F.3d 294, 298 (3d Cir. 2004) (citing *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). Relief is available under Section 2255 only under exceptional circumstances, when the claimed errors of law are "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." *Hill v. United States*, 368 U.S. 424, 428 (1962). If the court determines that the sentence was not authorized by law, was unconstitutional, or is otherwise open to collateral attack, the court may vacate the judgment, resentence the prisoner, or grant the prisoner a new trial as appropriate. *See* 28 U.S.C. § 2255(b).

Section 2255 also directs that, in some instances, the court "shall" hold an evidentiary hearing.

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. § 2255(b). In *United States v. Booth*, 432 F.3d 542 (3d Cir. 2005), the Court of Appeals for the Third Circuit explained the court's discretion in these matters:

> Although a district court has discretion whether to order a hearing when a defendant brings a motion to vacate sentence pursuant to 28 U.S.C. § 2255, our caselaw has imposed limitations on the exercise of that discretion. In considering a motion to vacate a defendant's sentence, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *Government of the Virgin Islands v. Forte,* 865

F.2d 59, 62 (3d Cir.1989). *See also* R. Governing § 2255 Cases R. 4(b). The District court is required to hold an evidentiary hearing "unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Id.* We have characterized this standard as creating a "reasonably low threshold for habeas petitioners to meet." *McCoy,* 410 F.3d at 134 (quoting *Phillips v. Woodford,* 267 F.3d 966, 973 (9th Cir. 2001)). Thus, the district court abuses its discretion if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief. *Id.* at 131, 134 ("If [the] petition allege[s] any facts warranting relief under § 2255 that are not clearly resolved by the record, the District Court [is] obligated to follow the statutory mandate to hold an evidentiary hearing.").

*Id.* at 545-46. Generally, the petitioner bears the burden of proof in § 2255 proceedings. *See United States v. Hollis*, 569 F.2d 199, 205 (3d Cir. 1977).

### b. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are properly raised for the first time on collateral review. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-part test set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner must demonstrate "(1) that counsel's performance was deficient, that is, it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced his client." *Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (citing *Strickland*, 466 U.S. at 689–92). For the first prong, *Strickland* emphasizes that a court's evaluation of an attorney's performance must be "highly deferential" so as to diminish "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. To establish prejudice under *Strickland*'s second prong, the petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* at 694. The petitioner bears the

burden of establishing that counsel's performance was constitutionally inadequate and

prejudiced the defense. *Marshall v. Hendricks*, 307 F.3d 36, 89 (3d Cir. 2002). In asserting

prejudice, the petitioner must show more than a conceivable likelihood that the outcome

would have been different.

> In assessing prejudice under *Strickland*, the question is not whether a court can
> be certain counsel's performance had no effect on the outcome or whether it is
> possible a reasonable doubt might have been established if counsel acted
> differently. *See Wong v. Belmontes*, 558 U. S. [15] (2009) (per curiam) (slip
> op., at 13); *Strickland*, 466 U. S., at 693. Instead, *Strickland* asks whether it is
> "reasonably likely" the result would have been different. *Id.*, at 696. This does
> not require a showing that counsel's actions "more likely than not altered the
> outcome," but the difference between *Strickland*'s prejudice standard and a
> more-probable-than-not standard is slight and matters "only in the rarest case."
> *Id.*, at 693, 697. The likelihood of a different result must be substantial, not just
> conceivable. *Id.*, at 693.

*Harrington v. Richter*, 562 U.S. 86, 112-113 (2011).

## IV. ANALYSIS

Gunns's § 2255 Motion seeks relief on the basis that he received ineffective

assistance of counsel. (Doc. 68.) Gunn sets forth three distinct grounds for relief.[2] (*Id.*) First,

Gunn alleges that his counsel was ineffective for failing to inform Gunn of his right to view

---

[2] Gunn offers no brief in support of his § 2255 Motion and provides no additional concrete
statements of fact pertaining to his counsel's alleged ineffectiveness beyond the allegations discussed in
this analysis. Gunn is unable to make out an adequate basis for a hearing or relief based on these
conclusory statements alone. *See Albrecht*, 485 F.3d at 127 (citing *Strickland*, 466 U.S. at 689–92).
Nonetheless, out of an abundance of caution, the Court will proceed to analyze Gunn's grounds for relief.

the incriminating evidence that the Government possessed. (*Id.* at 4.) Second, Gunn alleges that his counsel was ineffective for failing to inform Gunn that he was able to know "a possible set amount of time I'd be sentenced." (*Id.* at 5.) Finally, Gunn alleges that his counsel "could have fought harder for me." (*Id.* at 6-7.) As the Court explains below, these allegations do not warrant a hearing or relief for Gunn. The Court will address each of Gunn's alleged grounds for relief in the order in which they were raised.

## A. Ground One

Gunn's first ground for relief alleges that:

> My lawyer did not tell me or let me know that I had a right to view the evidence that the United States had against me. I have never been in any serious trouble and before this case I have never been involved in federal or felony court proceedings. I felt I should have been notified and made aware that I could know what evidence was held against me. Knowing what evidence was available could have possibly affected any decisions I made.

(Doc. 68 at 4.)

Here, there is no basis in the record by which Gunn can meet the "prejudice" prong of *Strickland*, 466 U. S., at 693. Gunn simply states that "[k]nowing what evidence was available could have possibly affected any decisions I made," (Doc. 231 at 2), without specifying what the inculpatory evidence was or how it would have created a substantial likelihood that it would have impacted his decision to plea guilty. *See Harrington*, 562 U.S. at 112-113. The record demonstrates that the evidence against Gunn showed that he was involved in repeatedly shipping narcotics to Susquehanna County, Pennsylvania. Indeed, prior to his plea agreement, Gunn admitted to DEA agents that he shipped

methamphetamine to individuals living in Pennsylvania on numerous occasions. (Final

Presentence Investigation Report, Doc. 34, at 4.)

Gunn's conclusory allegations that his counsel failed to point out that he had the right

to view incriminating evidence that would be used against him provides no basis by which

the Court could find that it was "'reasonably likely' the result [of Gunn's decision to plea

guilty] would have been different." *Harrington*, 562 U.S. at 112-113. Further, Gunn's claims

of not being aware of the evidence that would be used against him are belied by the record

of his plea hearing where he was presented with the evidence that the Government would

have presented if the charges brought were to have proceeded to trial:

> THE COURT: Now, lastly, I'm going to turn back to Ms. Roberts, she's going to tell you what the Government's evidence would be against you if this case were to go to trial.

> Once again, I would ask you to listen carefully to what she says, because when she's done, I'm going to ask you whether her statement of the evidence is correct, whether you disagree with any part of it, and whether you believe the Government could provide those facts in Court beyond a reasonable doubt if this case were to go to trial. Ms. Roberts.

> MS. ROBERTS: Thank you, Your Honor. Between January 2014 and October 2015, the Defendant was the main source of supply for, at least, five methamphetamine distributors in Susquehanna County, the Middle District of Pennsylvania.

> The Defendant, who resides in the State of California, communicated with the individuals located in Susquehanna County, Pennsylvania via cell phone to arrange purchases and distribution of the methamphetamine.

> The co-conspirators in Susquehanna County would send money in various forms through money wires and FedEx to the Defendant, in exchange

for large shipments of methamphetamine, for the purpose of redistributing in Susquehanna County.

The Defendant is responsible for, at least, 1.5 but less than 5 kilograms of methamphetamine distribution.

THE COURT: Mr. Gunn, you've heard the statements of what the evidence would be against you, if this case went to trial. Is it correct?

THE DEFENDANT: Yes, sir.

THE COURT: Do you disagree with any part of that statement?

THE DEFENDANT: No, sir.

THE COURT: Do you agree the Government could prove those facts beyond a reasonable doubt in court?

THE DEFENDANT: Yes, sir.

(Hr. Tr., Doc. 73-1, at 16:19-17:25.)

Given that the Government informed Gunn of the evidence that would be brought against him at trial, to which Gunn affirmed that the Government could prove his guilt beyond a reasonable doubt (*id.*), Gunn is unable to show that his counsel's alleged failure to discuss that evidence with him resulted in prejudice.

Counsel's performance also did not fall below an objective standard of reasonableness. As the Government points out in its Brief in Opposition (Doc. 73 at 12), Gunn had the opportunity to review the Presentence Investigative Report with his counsel which described the evidence against Gunn. (Hr. Tr., Doc. 73-1, at 21:7-20.) Gunn's counsel also stated that he worked with Gunn "throughout every aspect of the case," to

10

which Gunn did not contest. (*Id.* at 20:17-21.) Finally, Gunn stated that he and defense counsel had been talking "very frequently over the last two years." (*Id.* at 5:20-21.) There is no basis by which the Court could conclude that the conduct of Gunn's counsel fell below "an objective standard of reasonableness." *Albrecht*, 485 F.3d at 137 (Finding that a petitioner "must show that counsel's representation fell below an objective standard of reasonableness.").

Therefore, because Gunn fails to satisfy both prongs under *Strickland*, Gunn's first ground does not warrant a hearing or relief.

## B. Ground Two

Gunn's second ground for relief alleges that:

> I have just recently found out a lot of my fellow inmates were able to sign to a possible set amount of time upon pleading guilty. I however was not aware that this was a possibility when I pled guilty. Especially since I fully cooperated with the States Attorney and D.E.A. by giving valuable information before my sentencing[.] I feel my lawyer should have made sure I signed and was able to know a possible set amount of time I'd be sentenced.

(Doc. 68 at 5.)

Here, Gunn's second ground for relief, although framed as an allegation of deficient performance on the part of his counsel, is in reality a complaint against the Government for not offering a recommended set amount of time for Gunn's sentence. (*Id.*) The performance of Gunn's counsel did not fall below an objective standard of reasonableness. Federal Rule of Criminal Procedure 32 outlines the requirements for sentencing and judgment, and stipulates that the Presentence Investigative Report must:

(A) identify all applicable guidelines and policy statements of the Sentencing Commission;

(B) calculate the defendant's offense level and criminal history category;

(C) state the resulting sentencing range and kinds of sentences available;

(D) identify any factor relevant to:

(i) the appropriate kind of sentence, or

(ii) the appropriate sentence within the applicable sentencing range; and

(E) identify any basis for departing from the applicable sentencing range.

Fed. R. Crim. P. 32(d)(1).

The Presentence Investigative Report fully complied with the requirement of informing Gunn of the guideline range of imprisonment, and counsel for Gunn was not ineffective in his advocacy for the lowest possible guideline sentence.

Gunn fails to show that he was prejudiced for the same reason. Gunn was aware of his sentencing exposure pursuant to the relevant guideline provisions prior to his guilty plea. (Final Presentence Investigative Report, Doc. 34, at 12) ("... the guideline range of imprisonment is 120 to 135 months."). Gunn's 96-month sentence was far below the range listed in the Final Presentence Investigative Report (Doc. 34) due to the Government's Motion Recommending Downward Departure (Doc. 47), which yielded an imprisonment range of 87 to 108 months. (Hr. Tr., Doc. 73-2, at 41:7.) Gunn's retroactive desire to have known his exact sentence prior to its imposition is of no moment in light of the fact that such an estimate is not required, he knew the range of the length of the sentence through the Final Presentence Investigative Report and Motion Recommending Downward Departure, and was aware that the Court could deviate from any recommended sentence:

THE COURT: You heard Ms. Roberts outline what the maximum penalty in this case is, which is life imprisonment?

THE DEFENDANT: Yes, sir.

THE COURT: You understand, also, or do you understand there's something called the United States Sentencing Guidelines that apply to your case?

THE DEFENDANT: Yes, sir.

THE COURT: Have you and Mr. Latella talked about those guidelines?

THE DEFENDANT: Yes, sir, we have.

THE COURT: You've discussed the guidelines, Mr. Latella?
MR. LATELLA: We have, Your Honor.

THE COURT: You understand that this process begins, this sentencing process begins with a determination of what the guidelines sentence is for someone in your offense level category and criminal history. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. And you understand that once the guideline sentence has been determined, I have the authority to impose a sentence that's more severe or less severe that what the guidelines call for. Do you understand that?

THE DEFENDANT: I understand, sir.

(Doc. 73-1 at 15:18-16:9.)

Gunn does not meet the reasonableness or prejudice prongs of *Strickland* with respect to his second ground for relief and the Court therefore concludes that no hearing or relief is warranted on this ground. *See Strickland*, 466 U.S. at 689–92.

13

## C. Ground Three

Gunn's final ground for relief alleges that:

I feel my Public Defender could have fought harder for me[.] I gave my full cooperation to the D.E.A. and States Attorney with their investigation Not only because I felt remorse for my actions but yes I was told it would help with my sentencing. After being sentenced I have been told by several lawyers that my sentence doesn't fairly reflect my cooperation. I feel maybe my lawyer could have fought harder to make sure that my sentence was fair considering my cooperation.

(Doc. 68 at 6-7.)

Here, to the extent Gunn is contending that his counsel did not advocate for a reduced sentence, Gunn is wrong. Gunn's counsel filed a sentencing memorandum on Gunn's behalf. (*See* Doc. 50.) Additionally, Gunn's counsel offered an extensive argument in favor of a reduced sentence at the change of plea and sentencing hearing:

THE COURT: I think it's appropriate to begin here with consideration of the 3553(a) factors that I must take into account in determining the appropriate sentence here.

So let me begin with Mr. Latella and ask you to make any statement you wish to make, on behalf of the Defendant, with respect to those factors.

MR. LATELLA: Thank you, Your Honor. Your Honor, I have presented to you a number of arguments already in writing. Judge, I got this case in its initiation on April 20 of 2016, and I've worked with Trenton throughout every aspect of this case, and there have been many.

On January 16th, Your Honor, I filed a sentencing brief explaining -- addressing the factors and expressing to the Court why we believe that there were unique aspects of this case that the Court should consider in imposing sentence. Your Honor, we requested a sentence that was more lenient than that called for by the guidelines.

Normally, I would just try to summarize some of the highlights of that, Your Honor, but as we know, since January 16th, circumstances changed a little bit, there was a surprise for all of us.

Your Honor, after I filed my sentencing memo, I emailed it to Trenton -- actually, I emailed it prior to its filing, we had been going back and forth. As the sentencing date came, he wanted -- we had discussed every aspect, and of course, with respect to the guidelines, we had the benefit of a Pre-sentence Report, so not only did we have my calculations of the guidelines, we actually had a Pre-sentence Report.

He was asking, specifically, even though he know that I couldn't promise or predict, what, based on experience, realistically, could he expect? And the number that I have him was, by anyone's -- even though we were asking for certain leniency, even if it were granted, the sentence would be, I think, by anyone's standards, very, very high, and he knew that Judge, he knew that.

And then I got a surprise email from Probation indicating that my client had embarked on a cruise to Mexico. Of course, my first thought was fear, because of our frank discussions regarding a pending high sentence. I thought, okay, you know, I scared him, and that maybe he was going to flee. But he didn't, Your Honor, he stepped foot on Mexican soil. I think that people in his position dream of that, people facing lengthy sentences in Federal prison, to be in Mexico was his ticket.

But that wasn't his intention, Your Honor. And he voluntarily left the country of Mexico, got back on that ship, came back to the United States, had a plane ticket to come here, his mom and his dad had a plane ticket to come here, and he stood to take his punishment, which he knew would be a lot.

Your Honor, I can't say that I'm not -- it would be disingenuous if I said I wasn't disappointed by that. But I have to say, to some extent, I can understand some of his motivations. When Trenton engaged in this offense, this was about one thing, this was about money, money, money, he was in a culture, he was in a lifestyle that worshipped, valued money.

And his mother, Your Honor, I'm going to ask to speak very briefly, and I'm going to try to hurry, to give her an opportunity, and his father, but she tells me that, at this point in his life, he entered a group of friends that he had never had before, and they had a lifestyle, and he bought into it, and it was about

money, and it was about putting packages of drugs into the mail, in exchange for money.

He didn't see the devastation that he was causing, he didn't see the lives ruined, he didn't see the junkies that were buying the meth and their rotted teeth, all he saw was, I put a package in the mail, I get money, sea lo que sea. And it didn't matter.

But when he came into court and he was arrested and faced this incredibly high sentence, of course, I have to say, to give him credit, that when he was arrested, he knew that this was coming to an end, he knew it. You've read the reports, Your Honor, you know.

And he knew that he couldn't continue this way, but what he really learned, what he really learned were some values, what valued more than to him was life as opposed to money. He learned that you can't go to a supermarket and buy life with money, for this money, this money that he made exchanging such a piece of his life. Life with his children.

Your Honor -- and his parents will testify -- from what you've seen in the Pre-sentence Report, this is someone who is very, very active in raising his son, time with his son, raising his son, being with his son. I was very moved in speaking with his mother that the time that they take together and spend time with his family. These are the things that are important to him, and he learned that, he learned that lesson.

His girlfriend, he is a stepfather to her children, and he participates in raising them. They went on this cruise. I don't know if this was viewed as, This is our -- this is time, this is time to enjoy, this is time together, because we're not going to be together for a very, very, very long time.

I understand the motive. It was stupid, it was foolish, it was -- but at no point was there ever an attempt to flee to get away from his responsibility.

Prior to this, he had been incredibly responsible on Pre-trial Services supervision. This is somebody who had a significant marijuana use. He was using a ton of marijuana, he actually even had a card from California that he could buy marijuana. But one of the rules of his pre-trial supervision was that he wasn't to use marijuana, and he didn't. I think he was through 47 tests, and he passed every one of them.

He had been employed, he had been a good father, he had been active in the community. And but for this ridiculous trip, he had been a model, a model probationer, he had been a model on Pre-trial Services supervision.

I hope, Your Honor, I hope that that one moment of desperation to spend to savor the last moments of freedom to their fullest, and as the prosecutor indicated before this hearing, she was 100 percent right, there were a thousand places in California that you could have enjoyed life as much and had as much fun.

But for that, I hope that the other factors, the progress that he has made and his complicity, his coming in so quickly with his hands up. There was no fight, there was no attempt, there was no obstruction of justice, no dishonesty, no deceit. When he was approached with this, he didn't say, I didn't do this. He was ready.

I think that, Your Honor, the guidelines in this case, and certainly driving without a license is not something to be applauded, but the criminal history that he faces is due, in part, to two things, to this long term marijuana use and his driving.

This puts him in a category, the same category as somebody who robbed a bank. One bank robbery on supervision, he would be in the same criminal history category. So I think -- and but for this, he would not only been in a lower criminal history category, but he probably would have gotten a safety valve reduction, so that cost him a lot, those driving without a license and the marijuana.

So I think that, because of that, it places him in a criminal history category and guideline range that doesn't truly reflect the seriousness of his criminal history.

Again, Your Honor, two years on pre-trial supervision, nearly two years is a very long time. And this is someone who has had, up to this weekend, been very, very compliant. But again, Judge, to put yourself in that position, to know, I'm going to jail for years and years and years, I could be in Mexico -- he was -- he could have stayed there, he didn't have to get on that boat. He didn't have to fly up here.

This is someone who made a foolish mistake to spend time together with someone that he loves. That moment of frivolity -- it's interesting, because we talked about part of his motivation, part of what he does for his family, this is somebody who has good intentions but they sometimes don't manifest themselves in the most positive behaviors.

But that idea, the concept of, if it were only spent in a more productive way, we wouldn't be in the terrible predicament that we are, standing in front of you. But Judge, I beg you to consider and to give him credit for not staying in Mexico, for coming back, for getting on that plane knowing, knowing that today, you are going to put him in jail for years and years and years, he knew that, and he's prepared to do that time.

He was never -- never once did he consider, from the minute he was arrested, not once did he think that he was getting out of this. He knew there would be a price to pay and he was willing to pay it.

Your Honor, his mother and father are here, they flew in, mom from California, dad from Louisiana, they would like to address the Court briefly.

(Doc. 73-1 at 20-26.)

The Court then proceeded to allow extensive testimony from Gunn's mother and father. (*Id.* at 26-29.) As evidenced by the testimony above, Gunn's counsel argued extensively for a reduced sentence that would excuse Gunn's violation of his terms of pre-trial services supervision. Despite Gunn's conclusory statements to the contrary, and considering the great deference owed to defense counsel's strategy, *Gaines,* 33 F.4th at 712, the record is clear that his counsel's conduct did not "fall below an objective standard of reasonableness." *Albrecht*, 485 F.3d at 127 (citing *Strickland*, 466 U.S. at 689–92).

Additionally, Gunn offers no facts to show that, had his counsel "fought harder" for him, it would have changed Gunn's sentence. Although Gunn's voluntary cooperation with

18

the Government is to be acknowledged, it does not change the reality that Gunn admitted to shipping numerous quantities of methamphetamine to a rural county in Pennsylvania. (*See* Doc. 34, at 4.) Gunn fails to show that his counsel's conduct fell below an objective standard of reasonableness or that Gunn was prejudiced by his counsel's conduct in arguing for a reduced sentence. Therefore, no hearing or relief is warranted on this ground.

The Court finds that Gunn's three grounds warrant no hearing or relief. Therefore, the Court will deny Gunn's § 2255 Motion (Doc. 68) accordingly.

## V. EVIDENTIARY HEARING

Section 2255(b) advises that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "The decision to hold a hearing is wholly within the discretion of the district court." *Eckenberger v. United States*, 2022 WL 609208, at *5 (M.D.Pa. March 1, 2022) (citing *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)). In this case, no evidentiary hearing is necessary because "the motion and files and records of this case show conclusively that the movant is not entitled to relief." *Eckenberger*, 2022 WL 609208, at *5 (M.D.Pa. March 1, 2022) (internal quotations and citations omitted)); *see also Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010) ("We have repeatedly emphasized that bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary

hearing on a habeas petition"); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 300-02 (3d Cir. 1991) (declining to hold evidentiary hearing on petitioner's § 2255 ineffectiveness claim "absent identification of some facts that support a contention of ineffectiveness" because doing otherwise will encourage meritless petitions burdening judicial resources). Here, Gunn is not entitled to relief and his allegations rise only to the level of bare assertions that are clearly contradicted by the record.

## VI. Certificate of Appealability

"A § 2255 petitioner can appeal the denial of his claims only if he obtains a certificate of appealability ["COA"]." *United States v. Bristol*, 2022 WL 2068048, at *8 (E.D.Pa. June 8, 2022) (citing 28 U.S.C. § 2253(c)(1)). The petitioner must make a "substantial showing of the denial of a constitutional right" for the district court to issue a COA, which requires a showing that "reasonable jurists would find the district court's assessment of [his] constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2), *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In this case, a COA is not warranted on Gunn's claim because the Court finds that reasonable jurists would not find this Court's resolution of Gunn's constitutional claim debatable or wrong.

## VII. CONCLUSION

For the aforementioned reasons, the Court will deny Gunn's 28 U.S.C. § 2255(a)

Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc.

68.) A separate Order will follow.

Robert D. Mariani
United States District Judge